1

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
     Case No. 20-mj-00078-SKC-1
3    _____

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    YEN CHAM YUNG,

8         Defendant.
     _____
9

10            Proceedings before S. KATO CREWS, United States

11   Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 2:15 p.m., June 23,

13   2020, in the United States Courthouse, Denver, Colorado.

14   _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                          APPEARANCES

19            RAJNATH LAUD, Attorney at Law, appearing for the

20   Plaintiff.

21            LAURA SEULAU, Attorney at Law, appearing for the

22   Defendant.

23   _____

24                      DETENTION HEARING

25

2

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE COURT:  Okay, this is Judge Crews.  Today is

 6    June 23, 2020.  Before I call any individual matters, I have

 7    a couple of pronouncements regarding the

 8    video-teleconference and teleconferencing of these

 9    proceedings.

10              I'll first ask anybody who is participating to

11    please mute your telephone or mute your microphone if you

12    are appearing by video-teleconference.  I will note that the

13    Court is conducting these proceedings by video and

14    teleconference pursuant to the CARES Act and general orders

15    issued by the Chief Judge of this court.

16              Those orders pertain to pretrial criminal

17    proceedings and allow them take place by using remote

18    attendance and other social distancing means to the full

19    extent practicable.  This is based on the Court's response

20    to the spread of COVID-19 in its efforts to assist and

21    preserving public safety and health during the national

22    emergency.

23              Further, based on District Court General Order

24    2020-3, all persons participating in and attending these

25    proceedings, whether remotely by video or teleconference,
```

are prohibited under penalty of contempt from recording or broadcasting these proceedings in any manner.

Okay, the first matter that I'll call is 20-mj-78, United States vs. Yen Yung. And I will take appearances of counsel, please.

(Quality of audio is poor resulting in multiple inaudibles.)

SPEAKER: Good afternoon, Your Honor, this is (inaudible) Also appearing on this video connection is Rajnath Laud. If the Court recalls Rajnath referenced the fact that he has been (inaudible - cannot transcribe. (Audio to poor to transcribe rest of statement.)

THE COURT: Okay, thank you.

MR. LAUD: (Inaudible).

THE COURT: All right, good afternoon. And --

MS. SUELAU: Laura Suelau on behalf --

THE COURT: Go ahead.

MS. SUELAU: Laura Suelau on behalf of Yen Yung, Your Honor. Mr. Yung is in custody of Douglas County and he appears in the break room at interview 2 (inaudible).

THE COURT: Okay. Mr. Yung, can you hear me?

MR. YUNG: Yes. Yes, Your Honor, I can.

THE COURT: And can you see me?

MR. YUNG: Yes, sir.

THE COURT: Do you also see your attorney, Ms.

1    Suelau, on the screen?

2              MR. YUNG:  I can, Your Honor.

3              THE COURT:  And, sir, last time we met you did

4    give your consent for your proceedings to proceed by way of

5    video-teleconference.  Do I still have your consent to

6    proceed in that manner?

7              MR. YUNG:  Yes, Your Honor.

8              THE COURT:  And, sir, if at any time during these

9    proceedings you need to -- need to privately consult with

10   your attorney, please let me know that.  We will find a way,

11   or I guess we have a way for that to happen.

12             So if you need to consult with your attorney at

13   any time, feel free to interrupt these proceedings, let me

14   know that you would like to speak with your attorney, and we

15   will make sure that that happens.

16             Do you understand that?

17             MR. YUNG:  Yes, I do, Your Honor.

18             THE COURT:  And also, please, at any time -- and

19   this goes for anyone.  If at any time you have technical

20   difficulties, you can't hear what's taking place or

21   something of a technical nature happens, do your best to

22   alert the Court to that as quickly as possible.

23             All right, so let's see.  With respect to this

24   matter, we're here for a detention hearing.  I will note

25   that the Court has read the pretrial report and notes that

1    that report recommends a release on a PR bond and the Court

2    will take judicial notice of that report.

3              I understand the government seeks detention.  I

4    understand that Mr. -- is it Laud?  Am I saying that

5    correctly?

6              MR. LAUD:  Yes, Your Honor, laud.

7              THE COURT:  Okay, Laud.  I understand that Mr.

8    Laud is now appropriately admitted, has entered his

9    appearance and will be handling the detention portion of

10   this hearing.

11             So, Mr. Laud, it is the government's burden, and

12   so I will let you present whatever evidence and information

13   you'd like to present.

14             MR. LAUD:  Thank you, Your Honor.

15             And I want to start, as the statute does, with the

16   nature and circumstances of the offense and also the fact

17   there's (inaudible) plaintiff (inaudible) about a couple of

18   things.  One is the government filed (inaudible) detain Mr.

19   Yung as a serious risk of flight and (inaudible) that Mr.

20   Yung represents a danger and, in particular, not to us

21   (inaudible) but to a particular individual who was involved

22   in this case as a witness.

23             I will reference the pretrial report at times

24   because that -- the pretrial services officer, you know, is

25   actually, in regard to Mr. Yung's substantial time outside

1   of the United States, a recommendation was made and so I

2   think that's significant just in terms of sort of a pretrial

3   services recommendation in this case.

4           THE COURT:  And, I'm sorry, can you repeat --

5           MR. LAUD:  (Inaudible).

6           THE COURT:  You broke up for a moment.  You said

7   -- I didn't quite catch the aspect that you said you feel is

8   significant.

9           MR. LAUD:  I'm sorry, Your Honor.  Yes.  The

10  pretrial services officer does not appear to have been aware

11  of Mr. Yung's substantial ties outside of the United States

12  and, in particular, after (inaudible) in 2016, he lived in

13  (inaudible) Jakarta, India for approximately two years.  He

14  did travel back to the States in that time.  But given an

15  extended period of overseas employment is a pretty

16  significant factor when it comes to a risk of flight and it

17  -- that is not disclosed in the pretrial services report,

18  either in his employment or the overseas component of it.

19          Defense is contesting whether or not Mr. Yung has

20  any employment inside of America (inaudible) so exhibits

21  were registered (inaudible) -- the defense is not contesting

22  (inaudible) in which case I won't waste the Court's time on

23  that other than the significance of it for detention.

24          MS. SUELAU:  Your Honor, I'm going to (inaudible)

25  Mr. Laud is saying.  I don't know if it's just me, so I'm

1   sorry to chime in, but I just wanted to check and see if

2   that's my connection in which I need assistance.

3          THE COURT:  I think it might be yours, Mr. Laud.

4   I'm also -- you're -- I'm catching most of what you're

5   saying, but you are a bit choppy at times, but I'm

6   experiencing the same issue.

7          MR. LAUD:  (Inaudible) my telephone right now.

8   (Inaudible).

9          THE COURT:  Yeah.  Why don't -- maybe you should

10  do that.  Maybe you can mute your microphone --

11         MR. LAUD:  (Inaudible).

12         THE COURT:  -- there on the video and call in --

13  if you have a phone there next to you, maybe call in with

14  your phone.

15         MR. LAUD:  Your Honor, if I could have just one

16  moment to do that.

17         THE COURT:  Sure.

18         MR. LAUD:  Hello.  Can everyone hear me?

19         THE COURT:  Yeah, I can hear you.  Everyone else

20  can?  Okay.

21         MR. LAUD:  Okay.

22         THE COURT:  Hold on one second.

23         MR. LAUD:  Thank you.  I apologize for the --

24         THE COURT:  Okay, okay.  Great, go ahead.

25         MR. LAUD:  Thank you.  So I apologize for that.

8

1        I want to start briefly just with the nature of

2    the offense because it's not a commonly charged offense, as

3    far as I'm aware.  The complaint, as Your Honor is probably

4    aware, alleges that the defendant possessed several

5    documents marked "Secret" after he left the employment of

6    the FBI and alleges one of those documents, in particular,

7    possessed information relating to the national defense.

8    That said, he unlawfully retained that document.  And that's

9    -- the complaint further alleges that the defendant

10   possessed many, many unclassified documents that were FBI

11   property, as well as some additional physical property.  And

12   that's under a standard theft of government property,

13   unlawful retention of government property charge under 18

14   USC 641.

15        Just very briefly, because I think there's some

16   suggestion in remarks made by the defendant at the time of

17   his arrest, that it's common for people to -- who have

18   worked for the government to be in possession of classified

19   information.  I just want to very briefly touch on the

20   handling requirements for that information and the

21   seriousness of it, and I apologize if I'm belaboring a point

22   that is obvious to everyone,

23        But anything that's marked "Secret," information

24   that's classified "Secret" is subject to all sorts of

25   handling restrictions.  So it cannot be taken out of, you

1    know, government space and left unattended by someone who

2    works for the government or doesn't work for the government.

3    You know, "Secret" information -- if somebody has a file

4    marked "Secret" open on their desk and they leave the office

5    to grab something off the printer and left the entire office

6    as a secure space, they've got to take that document with

7    them or lock it up in a safe.

8          It's information that is -- there's a lot of

9    handling requirements and something that defendant, who had

10   a long career with the Bureau, would be well aware of.  And

11   I also want to touch on some of the other information that

12   is described in the complaint that was not classified, but

13   still very sensitive.

14         And we're talking about information regarding FBI

15   confidential human sources.  So people who are cooperating

16   with the FBI, including information about payment to those

17   individuals, information about internal investigations of

18   FBI personnel and even child pornography.  And certainly

19   we're not -- we haven't charged the defendant with

20   possession of child pornography, and I'm not alleging that

21   he himself has an interest in child pornography, but I am

22   highlighting it because it is information that is -- or

23   information and pictures that is very sensitive, you know,

24   should be handled very carefully.  And, again, not the type

25   of thing that you would expect somebody to inadvertently

1    have in their possession which somebody could have happened

2    upon the material.

3              So I think it's a very significant, serious crime

4    that's been alleged here.  Your Honor, the statute -- I'd

5    also direct you to consider the weight of the evidence.  You

6    know, I've been told that that's the least important factor

7    so I won't spend a great deal of time on the weight of the

8    evidence, other than to note that it's -- we believe it's

9    confirmed that items were found in the defendant's home.

10   One of the documents marked "Secret" also had his

11   fingerprints on it.  That's noted in the complaint.  And

12   while there was somebody else who resided in that home,

13   defendant was the only one who, you know, worked for the

14   government or had access to this sort of information.

15             Defendant, I think also it's clear that the

16   government will be able to prove that his conduct was

17   willful.  While he was still employed by the FBI, the

18   defendant lost his security clearance.  So it's noted in the

19   complaint that he lost his security clearance in 2015 and

20   then retired in 2016.  And as part of that process of losing

21   his security clearance, he actually, you know, went to an

22   out-briefing where, among other things, he was asked to

23   certify that he didn't retain any classified information

24   whatsoever.  So he certainly knew that he couldn't have this

25   type of information.

1          And then I don't spend a long time on this for

2     strength of the evidence, but I think it's significant that

3     at the time of his arrest, the defendant made several

4     unsolicited remarks to arresting agents outside of the

5     context of any sort of formal interview.

6          In fact, he was told that (inaudible) actually

7     interview him and he made reference to having the

8     information.  Things like, Headquarters sent me six boxes of

9     property and I didn't know what was in them.  If there was

10    any classified information, it was only what I wrote.  And

11    referenced to it only being a property crime and that they

12    think I'm selling intelligence to another country.

13         So I'm not putting a lot of weight on that, Your

14    Honor, in terms of the strength of the evidence, but I think

15    it's significant that (inaudible) understands what the case

16    is about and, you know, (inaudible) not a big deal.

17         I want to turn from that to the issue of risk of

18    flight and how the defendant's background makes him a

19    significant risk of flight.  And I apologize if I'm

20    long-winded, but I think the chronology is important.

21         The defendant worked for the Bureau for

22    approximately 20 years and -- for a period of time in

23    Chicago, then in Colorado, and then he received an overseas

24    assignment in Indonesia.  It's a position within the Bureau

25    called (inaudible).  Essentially, it's an agent who's posted

1    overseas, but is still an FBI agent.

2         And Mr. Yung held that position in approximately

3    2014 to 2015 (inaudible) time period, he was in Jakarta,

4    Indonesia and he was actually brought back before the end of

5    his formal rotation in that position and (inaudible) ended

6    up with him losing his access to classified information.

7    And then eventually, in 2016, he retired from the FBI.  And

8    almost immediately after retiring from the FBI, Mr. Yung

9    went to work for a wealthy Indonesian businessman and

10   somebody who he almost certainly came into contact with

11   during his time in Indonesia working for the FBI.  And this

12   employment is very significant in terms of risk of flight

13   for a number of reasons.

14        First, unlike many, many defendants that come

15   before the Court, Mr. Yung has fairly recently spent a

16   substantial amount of time living overseas, which is very

17   significant in terms of where somebody would go if they

18   decided not to stay and face the very significant criminal

19   charges facing him.

20        That's different than many defendants and it's

21   something that pretrial services was simply unaware of at

22   the time they made their recommendation.

23        It's also troubling, Your Honor, because the

24   defendant has made references to how wealthy and politically

25   powerful this individual for whom he worked was to the point

1    that during his state court supervision, which I'll get to

2    in a minute, on domestic (inaudible) --

3              THE COURT:  And then you --

4              MR. LAUD:  Travel --

5              THE COURT:  Sorry.  We lost you there for a

6    minute.  You said that you were referencing in -- maybe

7    representations made in the divorce and then I couldn't hear

8    you.

9              MR. LAUD:  Thank you, Your Honor.  I apologize for

10   that.

11             In that proceeding, and that's one of the exhibits

12   I've marked, Mr. Yung sought permission to travel to Los

13   Angeles and to also visit the Indonesian Consulate and the

14   Indonesian Embassy because he described it as necessary for

15   the contracting work that he was doing at the time.  And

16   that is, again, significant because Mr. Yung has portrayed

17   this individual for whom he worked as somebody who is

18   wealthy, politically connected in Indonesia, powerful;

19   somebody who would be in the position to basically protect

20   the defendant if he were to choose to leave this country and

21   go to Indonesia.

22             The other thing that the pretrial services report

23   does not discuss is assets located overseas.  In addition to

24   refusing to discuss his employment after the FBI, Mr. Yung

25   refused to discuss assets beyond those he described that

1    were the subject of the divorce proceeding.  And both of

2    those representations -- both of those refusals were again

3    made under advice of counsel.

4           And if there were nothing already concerning about

5    Mr. Yung, I would not ask the Court to hold that refusal

6    against him, but he has not clarified significant questions,

7    including what assets does he possess overseas, including

8    bank accounts, for example, in Indonesia that he would have

9    access to if he left the country.

10          Again, a very different situation than the, you

11   know, typical defendant who is, you know, facing charges and

12   the decision has to be made if they would be released or

13   not.

14          I expect that the defendant will argue that we

15   shouldn't worry about these substantial ties to Indonesia

16   because he didn't flee earlier and, in particular, he did

17   become aware, through the divorce proceedings, of the fact

18   that the FBI had recovered some of these items from his home

19   back as far as September -- the chronology is mid-August of

20   last year, and I believe he became aware in approximately

21   September of last year.

22          One thing I want to note, though, is up until the

23   time that Mr. Yung was arrested, there was no indication

24   that this was a criminal matter.  In fact, he repeatedly

25   took the position, through his counsel in the divorce

1    proceedings, that this was not a criminal matter and

2    actually wrote a letter to the FBI seeking the return of his

3    property.

4            So we are sitting in a very different situation

5    now where Mr. Yung knows that he has been charged criminally

6    and that he is facing these significant charges and it's not

7    something that just simply -- simply goes away.

8            So I think all of these things, these ties which

9    the probation office was not -- or I'm sorry, the pretrial

10   services office was not aware of, do make Mr. Yung a very

11   significant risk of flight.

12           I also want to touch on his past compliance with

13   Court orders and the potential for harm or interference with

14   a witness in this case.

15           Mr. Yung --

16           THE COURT:  Mr. Laud -- Mr. Laud, sorry.  Let me

17   interrupt you for a second before we shift gears.  Let me

18   ask you a few questions.

19           So his passport was seized; isn't that right?

20           MR. LAUD:  Yes.  His passport was actually turned

21   over with some of the property that was found in the home by

22   his estranged wife.  So his passport is in the possession of

23   the government, Your Honor.

24           I do think that it is possible that he could

25   obtain access to travel documents, even documents perhaps

1    issued by another country.  And one of the ways of doing

2    that would be to visit the Embassy or Consulate of another

3    country.

4         So I acknowledge that we're in possession of his

5    passport, certainly, Your Honor.  I don't think that removes

6    entirely the risk of flight, particularly for somebody as

7    sophisticated as Mr. Yung, who has traveled internationally

8    extensively in his capacity as an FBI agent, and then

9    afterwards for his current employer and, you know, knows the

10   systems incredibly well.

11        THE COURT:  And so you've maybe answered my next

12   question, but -- already with the answer you just gave.  But

13   how do you surmise he remains a risk of flight if the

14   government is already in possession of his passport and if I

15   were to impose the condition that his travel is limited to

16   the state of Colorado?

17        MR. LAUD:  Well, Your Honor, I think that is

18   really largely driven by his issue complying with court

19   orders in the past.  I am not confident that he would comply

20   with Your Honor's order, and I -- you know (inaudible), but

21   I do think that, you know, he could do things without

22   possession of his US Passport to leave the country if he

23   made that decision.

24        So --

25        THE COURT:  Okay, go ahead.

1          MR. LAUD:  Your Honor, I apologize.  The video is

2    frozen on my screen, but I can still hear.  Did Your Honor

3    have further questions --

4          THE COURT:  No.  Go ahead.

5          MR. LAUD:  -- at that point?

6          THE COURT:  You can go ahead and proceed with your

7    other proffers.

8          MR. LAUD:  Okay, thank you, Your Honor.

9          So as set forth in the complaint, these items --

10   this FBI property, the classified documents, and then the,

11   you know, thousands of reports -- other FBI reports, were

12   found in the defendant's home that he shared with his

13   estranged wife.  They're now going through divorce

14   proceedings and there's a couple of issues with regard to

15   that.

16         First of all, Mr. Yung made remarks at the time of

17   his arrest indicating that he believed this to be his wife's

18   fault.  So I think it is not a secret to him, it's frankly

19   obvious to everyone that his wife would potentially be a

20   witness at his trial.

21         This is troubling because Mr. Yung has twice

22   violated the order of protection that was issued against him

23   in connection with those state divorce proceedings.  First,

24   on August 20th of 2019, and I believe that violation took

25   the form of sending text messages to his estranged wife

 1   saying that she should not have filed for a TRO, which I

 2   believe to be a reference to a temporary restraining order;

 3   and that because of that, he wouldn't have his gun, which he

 4   believed was necessary to do future security work.  And, in

 5   fact, his wife did turn the defendant's guns over to the

 6   police.  And then just two days later after that violation,

 7   Mr. Yung showed up in the neighborhood and approached his

 8   neighbors attempting to gain access to the residence.  And

 9   this was after he had already been arrested on the first

10   violation of the order and he had a neighbor contact the

11   wife in an attempt to get access to the property.  And even,

12   I think, told the neighbor that he shouldn't have had him do

13   that because it was third-party contact to the order.  And

14   he was arrested for that violation, as well, and he did

15   spend a few days in jail and he ultimately resolved that

16   state case with a term of probation that he's currently on.

17          And then just one last thing I'll note on this

18   issue of danger to the community and, in particular, this

19   potential witness.  Mr. Yung, who, you know, is a former FBI

20   agent working in the counterintelligence field, prior to his

21   arrest, the FBI did conduct surveillance of Mr. Yung to, you

22   know, effectuate that arrest safely.  And on Tuesday last

23   week, they saw him in a position in a parked car with a view

24   of the back of the marital residence.  And I'm not

25   suggesting that he was close enough to that residence to be

1   in violation of any sort of restraining order, but it's

2   significant for a couple of reasons.

3           One is this was actually the first day that the --

4   his estranged wife had been back to that property in several

5   months and he appeared to be, you know, viewing, surveilling

6   the property, you know, where she had gone to retrieve some

7   items.  Neither of them had been living in the residence at

8   that time

9           And then interestingly, that very same day, his

10  attorney in the divorce matter first filed a motion seeking

11  to get Mr. Yung access to that property and then later that

12  day filed a motion to withdraw from representation of Mr.

13  Yung in the divorce proceedings.

14          So I mean, that -- making statements about the

15  wife at the time of his arrest and twice violating the order

16  of protection, again suggests that Mr. Yung was not somebody

17  who was necessarily going to follow a release order set by

18  this Court and could certainly attempt to contact or

19  influence this witness in some way.

20          So it -- again, it's a very troubling situation,

21  in particular, (inaudible) experience that Mr. Yung has his,

22  you know -- my understanding is he does not have access to

23  the firearms he had in the house at the time, but, you know,

24  his training (inaudible) as well is a very troubling

25  situation.

1           So combined with the very substantial risk of

2    flight in this, the government believes that the -- really,

3    that there are no conditions that could assure his

4    appearance and the safety of the community and Mr. Yung

5    should be removed to the Northern District of Illinois to

6    face the charges against him in the custody of the United

7    States Marshal Service.

8           THE COURT:  Okay, thank you.

9           Mr. Laud, with respect to the violations of the

10   protective order, it -- from what you've described, it

11   sounds like the violations were the result of him making

12   contact with the wife in derogation of the order.  Is there

13   an allegation, or was there also a factor that there were

14   threats made against the wife, or was it simply the contact?

15          MR. LAUD:  It's simply the contact, Your Honor.

16   You know, there was no explicit -- there were no explicit

17   threats made to the wife.

18          I can tell you that she reported to the Colorado

19   Springs Police Department that she found a reference to his

20   guns to be threatening.  And I can understand why in her

21   situation she would perceive it that way, but I do want to

22   be clear, he said he wanted those guns to do security work.

23   He didn't make any explicit threat regarding those guns and

24   his estranged wife.

25          THE COURT:  Okay.  And with respect to the

1    allegations in the complaint, as I understand the

2    allegations as they are currently posed, it's alleging

3    unauthorized possession of these various materials and that

4    -- and currently there are no allegations of any unlawful

5    use of those materials; is that right?

6            MR. LAUD:  That is correct, Your Honor.

7            THE COURT:  Okay.

8            MR. LAUD:  Yes.

9            THE COURT:  Okay.  And anything else, Mr. Laud?

10           MR. LAUD:  No, Your Honor.  I would like to -- if

11   something new is raised by the defense that Your Honor finds

12   it helpful for me to respond, to have the opportunity to do

13   that, but, otherwise, I have nothing to add at this time.

14           THE COURT:  Okay.  Yeah, since it's your burden, I

15   will give you an opportunity for rebuttal.

16           MR. LAUD:  Thank you, Your Honor.

17           THE COURT:  Okay.  Ms. Suelau?

18           MS. SUELAU:  Thank you, Your Honor.

19           First of all, I want to address Mr. Laud's

20   arguments related to the pretrial report and perhaps that's

21   due to his sort of blanket view of what happened in the

22   pretrial -- the preparation process.  So I think it might be

23   helpful to say what typically happens and what happened

24   specifically in this case that would lead Mr. Laud to

25   conclude that Mr. Yung refused to talk about a number of

1   things when, in fact, that's not true.

2          What happened in this case is I received a notice

3   of Mr. Yung's arrest and the affidavit between 10:30 and

4   10:50 yesterday morning.  I was then notified by probation

5   that they would like to do an interview (inaudible) and that

6   timeframe is typical, but it gave me very limited time to

7   speak to Mr. Yung and have that interview.

8          So what that means is that ultimately in this

9   case, I saw that their allegations were related to his

10  employment at the FBI and so we declined to talk about any

11  employment.  It wasn't that Mr. Yung was trying to hide his

12  employment subsequent to his time at the FBI; it was really

13  that in that time frame, I did not have time to consult with

14  Mr. Yung about what would and wouldn't be appropriate to

15  talk to the probation officer with.

16         Subsequent to that interview, I talked to Mr. Yung

17  at length and he does not dispute and as has (inaudible)

18  he's not trying to hide it, that after he was an attache of

19  the FBI in Jakarta on assignment, he had (inaudible)

20  connections there that were going through -- over the course

21  of that employment and then he was hired on a private basis

22  from 2016 until 2018 to work in Jakarta.

23         So that doesn't mean he's trying to hide or that

24  he had reason to hide.  It was then at my advice, based on

25  what I knew telling after I received the affidavit.

1          In relation to whether or not he was dishonest

2   about his bank account in Jakarta, I think it's important to

3   note that information asked by probation about financial

4   resources is kind of broad and limited.  So he just

5   clarified that he had this amount of money in cash and

6   investments, but he was not asked to tell us where each

7   account is, how much is in each account, that's just not

8   what happened in that very limited timeframe because

9   probation was also under time constraints.  And (inaudible)

10  by 2:00.

11         So that's what that process looks like.  As I

12  said, the government to, you know, infer all of this

13  duplicitous or (inaudible) refusing behavior and that's

14  simply not what happened.  And to the contrary on the bank

15  account, what we know from the divorce proceeding is that he

16  just closed that bank account, that job, everything through

17  the course of those appellate proceedings and I had verified

18  that information by speaking to his divorce attorney, who

19  did not withdraw from Mr. Yung's case, Robert Crews (ph) and

20  I spoke to Mr. Crews at length yesterday.

21         What Mr. Crews confirmed, which I think is

22  implicit and arduous in what the government is stating is

23  that this is a very acrimonious divorce and that's certainly

24  regrettable.  It's regrettable for all parties involved.

25  That the government -- I'm sure this is at the (inaudible)

1  has essentially weaponized that against Mr. Yung.

2  (Inaudible) has weaponized this prosecution as part of that

3  divorce proceeding.  In fact, when she submitted temporary

4  orders to the Court, she represented to the Court through

5  her lawyer that Mr. Yung would be going to prison and that

6  as a result of him going to prison, she should receive a

7  larger portion, 70 percent, of his assets because he would

8  be unable to work and support her.

9          So she has a vested interest in telling the

10  government things that would benefit her in her divorce

11  proceedings.

12          THE COURT:  And where are you getting that

13  representation, Ms. Suelau?  It sounded like you were

14  reading that from something.  By the wife?

15          MS. SUELAU:  Yeah.  I -- Mr. Crews submitted to me

16  a copy of the temporary orders in this case.  They are not

17  final, so I have not submitted them to Your Honor.  I'm just

18  proceeding by proffer, but I can as a temporary -- Your

19  Honor, is during -- basically what the joint agreement would

20  be between the parties at the divorce, however is not joint

21  because Mr. Yung has not agreed to that obviously, but that

22  is what his attorney told me.

23          THE COURT:  Okay.

24          MS. SUELAU:  But (inaudible) is seeking 70 percent

25  of the assets, representing to the Court -- the divorce

1    Court that Mr. Yung would be going to prison.

2             So (inaudible) you know, I know the government

3    sort of said, Well, you know, Mr. Yung didn't know this was

4    criminal or anything like that, but that's simply not true.

5    Her divorce lawyer as early as September said that Mr. Yung

6    is under investigation by the FBI and then (inaudible) I

7    submitted to Your Honor at discovery -- Defense Exhibit B.

8    Clearly there Mr. Yung is (inaudible) aware that he was

9    under -- that some of his personal property had been seized

10   by the FBI.

11            he was an agent for the FBI and so I don't think

12   that he thought they just had it for -- I don't -- the

13   purpose of storing it.  I think that he understood that he

14   was under investigation or the FBI would have returned the

15   property when he asked for it back in the fall.

16            So he would have been under no delusion that he --

17   but he understood that he was under investigation by the FBI

18   and then the rest didn't lead to Jakarta.  It doesn't make

19   sense that he would do that now that he's been arrested when

20   he could have done it easily, obtained another passport

21   without Court orders preventing him from doing so in the

22   intervening time.  Sometime between September and present,

23   he could have easily obtained a passport and left the

24   country.  He did not do that.

25            And, Your Honor, the government arguments in

1    regards to the weight of the evidence.  Again, I think that

2    a very contentious divorce should worry -- should influence

3    some of this Court's, you know, view given that so much of

4    the affidavit is based on individual, who is Candice Yung,

5    Mr. Yung's wife, and her (inaudible).

6            The physical evidence we have that are documents

7    between 25 and 5 years old, and we don't have any evidence

8    of (inaudible) access.  This fingerprint evidence is on

9    documents from 1997.  However, they are Mr. Yung's

10   documents, documents that he created in 1997.  And

11   certainly, as Your Honor is aware, could have -- while that

12   document could have been created in 1997 when that document

13   was created or it could have happened last week (inaudible)

14   in September when the FBI received those documents, but we

15   haven't heard anything in any affidavit that says this

16   document was accessed subsequent to leaving the FBI in 2016

17   or subsequent to 1997.

18           So the evidence seized are temporary (inaudible).

19   We don't have any evidence that even if this criminal

20   conduct the government alleges is true, that that happened

21   in the last five years.

22           As for Mr. Yung's actual history and character

23   (inaudible), and I understand that the government is using

24   his employment as an FBI agent against him, but it should be

25   noted that Mr. Yung worked for the FBI, served his country

1    for over 20 years.  Prior to that, he was a police officer.

2    He was an agent that maintains -- he currently maintains

3    friendships with other FBI agents.  It's not that he left

4    under bad circumstances.  He was eligible for retirement and

5    (inaudible).  He's been living with a friend (inaudible) to

6    this Court, (inaudible) for the last ten months where he has

7    not been allowed to go back to his residence.

8           Contrary to what the government stated that Mr.

9    Yung's conduct during the course of their divorce, Mr.

10   Shannon said -- told this Court that he has handled this

11   procedure with integrity, but as I told counsel again that

12   it's been very difficult for Mr. Yung and (inaudible)

13   through that with some grace.

14          So as for the other ties to the community,

15   including -- and specifically Colorado Springs, he had lived

16   there and owned a home for over ten years.  He has not been

17   out of the country.  This presentence investigation report

18   says 19 months.  I recall Mr. Yung saying 15 months. Again,

19   we were on the phone, so that could just be a mistake there,

20   but he was completely honest about having left the country

21   15 months ago.  And when he was last in Jakarta, it was with

22   a purpose of attempting to clear that -- his bank account in

23   Jakarta because he doesn't plan to return there.

24          He did attempt to clear the account.  He had some

25   difficulties because he's not Indonesian, and he intended to

1   go back to effectuate that disclosure, but the fact of the

2   account, which has approximately $30,000 in it, is no secret

3   and he's been very honest about that in his divorce

4   proceedings that he did intend to close it, which I think

5   goes to show he doesn't intend to (inaudible) and I think he

6   would probably be hard pressed to do that on $30,000.

7          Why don't I just -- one moment, Your Honor --

8   address these violations of the protective order.  The

9   government referenced two violations as the pretrial

10  services report makes clear.  One of those violations was

11  dismissed.  Mr. Yung's attorney Robert Crews represented to

12  me that those violations are technical.  (Inaudible)

13  technical violation.  The violation to which he pled are

14  subject to a differed sentence agreement.  (Inaudible) Mr.

15  Yung received the protective orders and Mr. Yung's

16  attorney's account of the events, what essentially happened

17  was that Mr. Yung was served the papers while he was in the

18  home and then before he could fully process with his

19  attorney what those papers meant and understood a protective

20  order (inaudible) physical contact, or any contact at all,

21  (inaudible) him to the police.

22          So the criminal matter was dismissed.  It was more

23  of a civil matter that he's under.  and I spoke to Mr.

24  Yung's supervising officer, (inaudible), with the probation

25  department, and she represented to me that Mr. Yung has been

1   in compliance with all conditions of his supervision.

2   That's what I submitted to the Court, the conditions that I

3   submitted to the Court as Exhibit D.  (Inaudible) 19

4   conditions, and Ms. (inaudible) verified to me that he's in

5   compliance, that he originally was supposed to meet with her

6   every 30 days, but did (inaudible) to every 60 to 90 days.

7           So that's not a failure to follow Court orders.

8   That's a misunderstanding, a technical violation, which if

9   he was compliant would be dismissed at the end of the

10  deferral period and he has, thus far, been in complete

11  compliance (inaudible) ten months to show that compliance.

12          And if we turn to the Government's Exhibit 2,

13  which is Mr. Yung's asking the State Court for permission to

14  travel, this is further evidence that this is a man who

15  respects the law and follows Court orders.  He is asking

16  that he be allowed to go to Los Angeles and New York for his

17  work.

18          So this is someone who understands that when he's

19  under the orders of the Court, he needs to ask for special

20  permission to do things and that he doesn't take that

21  obligation lightly.

22          One moment, Your Honor.  (Inaudible) to do this is

23  the government's general accusation that Mr. Yung, who has

24  thus far been a completely law abiding citizen until, you

25  know, this small thing at the time of the divorce,

1    (inaudible) the legal systems and a legal means to obtain a

2    passport, and that somehow, them having his passport

3    wouldn't preclude him from doing that, and I just don't

4    think that there's any evidence to support that.  He's never

5    engaged in illegal activities previously.  Again, he's had

6    the passport seized since September.  He could have got

7    another one illegally any time between September and now and

8    so there's no reason to believe that suddenly he would

9    become this international guy who knows how to obtain and

10   will obtain illegal documents and who'll get another

11   passport and flee the country.

12          That is what I think amounts to scare tactics and

13   it's not supported by anything other than the government's

14   general assertion that that could happen.  I suppose that

15   could happen in any case, but (inaudible) case with someone

16   who has no criminal history and has not shown himself to be

17   a risk for flight or a danger to the community, then it's

18   highly unlikely that he will suddenly resort to those means.

19          As for the danger to Candice Yung, I think I've

20   addressed that the wife's allegations of his dangerousness

21   should not be relied upon.  She's not here to testify, the

22   government has not called her as a witness.  These are

23   reports that she's making to the government and to her own

24   benefit in hopes that Mr. Yung is detained, and then she

25   can, you know, use that detention as a basis for receiving

1   70 percent of his assets.

2           He has every reason to not harm her and not flee.

3   This is an ongoing divorce proceeding.  He hopes to appear

4   in court tomorrow as scheduled to be part of that proceeding

5   and hopes to be exonerated in the instant case.  So he has a

6   way to get to Chicago, he has the resources to get himself

7   there and he could get himself there as early as Thursday,

8   again, after that divorce hearing on Wednesday.

9           So for those reasons we don't believe the

10  government has met their burden.  There's a presumption that

11  Mr. Yung should be released.  And thirdly, the government's

12  general assertion that this man who has served his country

13  for over 30 years and served as a law enforcement officer

14  for over 30 years and has not had a single (inaudible)

15  violation would suddenly flee the country and not deal with

16  the instant offense or would suddenly become violent towards

17  his wife when he has no history of violence and the only

18  violation we're talking about is a technical civil violation

19  is offensive and should not be considered by this Court.

20          Thank you.

21          THE COURT:  Ms. Suelau, so if released would your

22  client continue to reside with, is it Mr. Shannon?

23          MS. SUELAU:  Your Honor, temporarily Mr. Yung

24  would reside with Mr. Shannon.  Based on the temporary --

25  the orders that I referenced and from the attorney, Mr. Yung

1    it does appear would retain a residence and his wife has

2    agreed to allow him to retain the residence.  So if that's

3    ordered, he would return to his residence, but for now he

4    would be released to Mr. Shannon's home where he's been

5    living for about ten months.

6            THE COURT:  So the other residence, is that the

7    one that's noted in the pretrial services report?  Because

8    there's one address listed --

9            MS. SUELAU:  Yes, Your Honor.

10           THE COURT:  -- that's different from Mr. Shannon's

11   and so I wanted to understand why the difference in

12   addresses.

13           MS. SUELAU:  The difference is that Mr. Yung

14   anticipates that at tomorrow's divorce proceeding he will

15   get the marital home.  He intends to return to the marital

16   home, his home, in Colorado Springs in the next week or two

17   and for -- so until then, he can reside with Mr. Shannon at

18   the address listed by Mr. Shannon, which is the 2626

19   (inaudible) and that's Colorado Springs as well that's an

20   hour or two from Mr. Yung's home.

21           THE COURT:  Okay.  And I did receive your exhibits

22   A through D.  Did you provide copies of those to government

23   counsel in advance?

24           MS. SUELAU:  I did, Your Honor.

25           THE COURT:  And does -- Mr. Laud, do you have any

1   objection to the Court receiving those exhibits into

2   evidence?

3           MR. LAUD:  No, Your Honor.

4           THE COURT:  Okay.  And similarly, Mr. Laud, I did

5   receive from you -- from your side, Government Exhibits 1

6   through 3.  Did you provide those to Ms. Suelau in advance?

7           MR. LAUD:  Yes.  I actually believe my colleague

8   in the district did.

9           MS. SUELAU:  Yes, Your Honor, those were supplied

10  to defense counsel.

11          THE COURT:  Okay.  And Ms. Suelau, do you have any

12  objection to the Court receiving those exhibits into

13  evidence?

14          MS. SUELAU:  No, Your Honor.

15          THE COURT:  So the record will reflect that the

16  Court has received Exhibits A through D of the defendant and

17  then Exhibits 1 through 3 of the Government for purposes of

18  considering the issue of detention.

19          (Defense Exhibits A through D and Government

20  Exhibits 1 through 3 were admitted into evidence.)

21          THE COURT:  Ms. Suelau, do you have anything else

22  to add to your proffer?

23          MS. SUELAU:  No, unless Your Honor has additional

24  questions.

25          THE COURT:  Okay.  I don't, thank you.  Mr. Laud,

1    I'll give you an opportunity for rebuttal.

2              MR. LAUD:  Thank you, Your Honor.  Just very

3    briefly.  On the question of whether or not Mr. Yung

4    intentionally (inaudible) overseas ties, I'm certainly not

5    asking Your Honor to draw that conclusion based on the

6    pretrial services report.  What I think is significant

7    though is that those ties do exist.  I think there's a

8    reference to, you know, somebody could leave the country

9    without a travel document in any case, and respectfully,

10   Your Honor, because of his connections overseas the

11   defendant -- it's not any case.  He is in a unique situation

12   to do that.  And the possibility of criminal prosecution,

13   Mr. Yung I'm sure knows from his years of experience, is

14   very different that prosecution actually moving forward.  So

15   he does find himself in a very different situation now.

16             Just very briefly, you know, my understanding is

17   this is not a preliminary hearing, but the offenses charged

18   are continuing offenses.  So as long as he retained those

19   documents, the statute of limitations would continue to

20   (inaudible) for the charged document of classified

21   information.  The memorandum of understanding between the

22   CIA and the FBI, that document, there is specific details in

23   the complaint about when Mr. Yung accessed it in Chicago.

24             I want to note that while Mr. Yung has presented a

25   letter from Mr. Shannon, you know, there were other things

1    that Mr. Shannon could do if he wanted to support Mr. Yung

2    in this criminal prosecution.  I haven't heard any

3    suggestion from the defense that Mr. Shannon be a third

4    party custodian who would be responsible for monitoring the

5    defendant's compliance with conditions.  And, in fact, I

6    haven't heard any conditions suggested by the defense and I

7    think if, you know, (inaudible) certainly don't believe that

8    the defendant should be detained, but if he's released, this

9    is a case where I think, you know, basic minimum conditions

10   would be required to address these risks and, you know, Mr.

11   Shannon has not appeared here.  We are certainly not relying

12   on statements from the estranged wife.  She's not a witness

13   here and it really, I think, doesn't matter too much.  The

14   documents are what they are and were found where they were

15   found and she's not even a witness to the finding of the

16   documents -- for some of the documents, but, you know,

17   certainly Mr. Shannon is not here.  He's not available for

18   examination by the Court and he hasn't offered to be a third

19   party custodian.

20          And then I just want to briefly address the order

21   of protection issue.  I don't want to get into a lengthy

22   back and forth on this, but counsel is focused on the first

23   violation and that is a violation that Mr. Yung chose to

24   admit and I'm sure it's not uncommon for an additional

25   violation to be dismissed as part of a resolution of a

1   (inaudible) like this, but he violated again just a couple

2   of days later.

3          So, you know -- and actually sought to

4   (inaudible).

5          MS. SUELAU:  Your Honor, I would object to

6   allowance on the dismissed count.

7          THE COURT:  I'll allow it.  Overruled.  Go ahead,

8   Mr. Laud.

9          MR. LAUD:  Thank you, Your Honor.

10         So I don't really have much to add to that other

11  than that I don't think this is a situation where we can

12  conclude that his only violation was -- you know, was

13  inadvertent in some way, and I'm sure that in admitting to

14  the violation, he also did not say that it was inadvertent.

15         So, Your Honor, for those reasons and the reasons

16  I (inaudible), government continues to believe that

17  detention is appropriate in this case and certainly it's not

18  a case that's appropriate for the defendant to be released

19  without supervision, without a third party custodian,

20  without some sort of electronic monitoring to know where the

21  defendant is and whether he is, in fact, leaving the

22  location that he's supposed to be.

23         THE COURT:  Okay, thank you.  All right, give me a

24  moment, please.

25         MR. YUNG:  (Inaudible).

1          MS. SUELAU:  Mr. Yung, I'm going to advise you not

2     to say anything.  Thank you.

3          MR. YUNG:  (Inaudible).

4          THE COURT:  We can arrange to have you have a

5     private consultation with your counsel.  Let me just find

6     out technically how we do that here.

7          MR. YUNG:  It's easy over here to make a phone

8     call.

9          MS. SUELAU:  (Inaudible) our calling line.

10         THE COURT:  Is there a phone?  Yeah, so if a phone

11    -- can Ms. Suelau ensure that you mute your microphone --

12         MS. SUELAU:  Yes.

13         THE COURT:  The video and the officer there, if

14    you'll ensure that the microphone associated with the video

15    is also muted and then the two of you can speak by

16    telephone.

17         MR. YUNG:  Yes, Your Honor.  Just (inaudible).

18         THE COURT:  Okay.  So you'll need to (inaudible)

19    over there?  Is that what that means?

20         MR. YUNG:  (Inaudible).

21         THE COURT:  Okay, that's fine.

22         MR. YUNG:  Okay.

23         THE COURT:  While all of this is happening, I'll

24    go ahead and take a recess -- well, we'll take a recess.

25    I'll need a -- I'll take maybe 10 - 15 minutes or so in

1    recess.  Ms. Suelau, you can take the time you need with

2    your client.  If I'm out -- if I'm back out before you

3    return, that's fine.  We'll -- we can all simply wait.

4            So we'll go ahead and --

5            MS. SUELAU:  Okay, thank you.

6            MR. YUNG:  (Inaudible) my supervisor (inaudible).

7            MS. SUELAU:  (Inaudible) that number right now.

8    It's 303 --

9            SPEAKER:  Got it.

10           MS. SUELAU:  965-7229.

11           SPEAKER:  Okay, I got it.  Thank you.

12           MS. SUELAU:  Thank you.

13           (Recess was taken.)

14           THE COURT:  Okay.  We'll go back on the record in

15   20-mj-78, United States vs. Yen Yung.  We took a recess in

16   part so that Mr. Yung could have a private consultation with

17   his counsel as he requested and then also so that the Court

18   could further deliberate on the issue of detention.

19           Ms. Suelau, did you and your client have

20   sufficient opportunity to consult privately?

21           MS. SUELAU:  We did.  Thank you, Your Honor.

22           THE COURT:  Okay.  Okay, I am ready to rule on the

23   subject of detention.  This matter is before the Court on

24   the request of the government to detain the defendant

25   pending the trial of this matter.  The Court entertained

1   proffers by counsel from both sides.  In addition, the Court

2   received into evidence Government's Exhibits 1 through 3 and

3   Defendant's Exhibits A through D.

4         In considering the Government's request for

5   detention, I'm guided by several general principles.  First,

6   at all times, the defendant is entitled to the presumption

7   of innocence.  Nothing that took place in the detention

8   hearing or that I set forth in my findings is intended or

9   should be construed to affect that presumption.  Rather, the

10  purpose of this hearing is to determine whether, not

11  withstanding the presumption of innocence, whether the

12  defendant should be detained pending trial.

13        Second, under the Bail Reform Act, pretrial

14  detention is understood to be an exceptional step.  Under

15  the Act, a defendant must be released prior to trial unless

16  a judicial officer finds that no conditions or combination

17  of conditions exist which will reasonably assure the

18  appearance of the defendant or reasonably assure the safety

19  of any other person or the community.

20        Third, the Act requires that the least restrictive

21  conditions be imposed that are necessary to provide those

22  reasonable assurances.  If I cannot find any conditions that

23  will reasonably assure the appearance of the defendant as

24  required or the safety of persons or the community, then I

25  am required by the Act to order the defendant detained.

1          In this case, the Government seeks detention under

2    Section 3142(f)(1) on the ground that the defendant poses a

3    danger to another and also under Section 3142(f)(2) on the

4    ground that the defendant poses a risk of flight.

5          On the subject of risk of flight, the Government

6    must show by a preponderance of the evidence that no

7    conditions or combination of conditions will reasonably

8    assure the defendant's presence as required.  And on the

9    subject of danger to another or the community, the

10   Government has a higher burden it must show by clear and

11   convincing evidence that no conditions or combination of

12   conditions will reasonably assure the safety of the

13   community or another.

14         In addition, the Court considers the 3142(g)

15   factors under the Bail Reform Act.  Those factors include

16   the nature and circumstances of the alleged offense, the

17   weight of the evidence against the defendant, the history

18   and characteristics of the defendant and the nature and

19   seriousness of the danger to others or the community.

20         I've considered all of the evidence proffered by

21   counsel.  I've considered the exhibits received into

22   evidence.  I have also considered the pretrial services

23   report, which I've taken judicial notice of and the Court

24   notes that that report recommends release on personal

25   recognizance.

1          Based on the evidence, I find that the Government

2     has not met its burden of showing by a preponderance of the

3     evidence that no condition or combination of conditions will

4     reasonably assure the defendant's attendance.  I further

5     find that the government has not met its burden of showing

6     by clear and convincing evidence that no condition or

7     combination of conditions will reasonably assure the safety

8     of any other person or the community.

9          The Court notes in those regards that the

10    defendant has no history of violence, no criminal history

11    other than the violation of a protection order which appears

12    to be a technical violation and counsel for the Government

13    has confirmed that there were no threats of violence

14    associated with that violation and although his criminal

15    history would suggest or show a second violation of a

16    protective order, that alleged violation was dismissed.

17         Further, the defendant has a stable residence but

18    for the circumstances around the divorce.  The Government

19    has seized and therefore possesses the defendant's passport.

20    Government Exhibit Number 2, which is a motion to travel out

21    of state that the defendant filed in his divorce

22    proceedings, evidences his compliance with Court orders and

23    further his availing himself of the correct procedures to

24    seek relief from the Court

25         While the defendant does have ties to other

1    countries and connections or perhaps knowhow as a former FBI

2    agent, there's no evidence beyond the speculative to suggest

3    that these factors make him a greater danger or threat for

4    flight risk.

5          Further to that point, there are no allegations by

6    the government that the defendant poses a danger to the

7    United States and the complaint does not allege any use of

8    any of the materials allegedly in the defendant's -- or

9    unlawfully in the defendant's possession

10         And as I've noted, while the government's focus in

11   terms of danger was to the defendant's wife, but there's

12   been no evidence presented to -- other than a technical

13   violation of a protective order to suggest that the

14   defendant has, in fact, threatened or caused physical harm

15   or other harm to the wife.

16         Further, the Court finds that the fact of the

17   pending divorce proceedings is further some incentive for

18   the defendant to not flee in order to have those proceedings

19   resolved in as favorable a position for him as possible.

20   The Court also notes the defendant -- according to the

21   pretrial services report, the defendant has been in the

22   Colorado Springs community for at least ten years.  The

23   defendant is educated -- is an educated person, he has a

24   bachelor's degree in psychology.  He's 57 years old.  He was

25   employed by the FBI for 20.5 years, which the Court notes

1   simply is a significant period of stable employment.  And

2   for those reasons that bear on 3142(g) or these findings

3   bear on the factors in 3142(g) and for the reasons I've

4   stated, the Court finds the government has not met its

5   burden and therefor will order the defendant's release on

6   conditions.

7            Appearance bond?  So, Counsel, I am taking a look

8   at the appearance bond and the form for conditions of

9   release, in case you're wondering what I'm doing here.

10  Thank you.

11           As I'm doing this, are there questions about the

12  Court's ruling from either side?

13           MR. LAUD:  No, Your Honor.  Do you intend for the

14  parties to be heard on the conditions of release or is that

15  something Your Honor is addressing now?

16           THE COURT:  Well, I intend to address it, but I

17  will -- I'll entertain any arguments with respect to those

18  conditions.

19           MR. LAUD:  So, Your Honor, I have some proposals.

20  First of all, I think that this is a case where Mr. Yung

21  does not say that he's presently employed.  Your Honor has

22  focused on the stable residence and the fact that he has a

23  place to go in the community.  So I would suggest that, at

24  least for an initial period, that he be on a period of

25  either home detention or curfew at that residence with some

1  form of location monitoring.  I know practices vary by

2  district as to what types of location monitoring are

3  available to pretrial services.

4          I would suggest some conditions on not having

5  contact with individuals, including contact with persons

6  located overseas or the Embassy, Consulate or officials from

7  any foreign power, and then I think it may be obvious, but I

8  think it should be in the conditions that he should not have

9  contact with the estranged wife apart from official

10  proceedings related to the divorce.

11          I know that no third party custodian has been

12  proposed.  That was going to be a condition that I would

13  suggest.  You know, that it -- I don't know if that's

14  practical at this juncture in the proceedings, but, you

15  know, you have somebody who's a former FBI agent with whom

16  the defendant resided, who's written him a letter of

17  support.  It seems like a logical step for that person to

18  step up and be a third party custodian and -- so that would

19  be my suggestion.  And then I think Your Honor already

20  touched on this, but obviously we do not want him to obtain

21  any travel document or to possess any sort of weapons.

22          THE COURT:  Okay, thank you.  Ms. Suelau?

23          MS. SUELAU:  Your Honor, we have no objection to

24  those conditions to justify probation, E, not obtaining a

25  passport and, G, not having any contact with anyone who was

1    a victim or witness in this investigation.

2            As for the additional conditions suggested by the

3    government, the location monitoring and third party

4    custodianship are typically imposed in the case far

5    different than this case.  You know, Mr. Yung is simply not

6    a risk of flight and location monitoring is difficult in a

7    case where he's going to be released in the District of

8    Colorado, but is expected to appear for court in Illinois

9    and then he'd have to either fly or drive there.  So I don't

10   believe that that kind of condition is either necessary or

11   practical.

12           It's -- you know, I did not ask Mr. Shannon

13   whether he would be willing to serve as a third party

14   custodian.  I do know that he (inaudible) for Mr. Yung in

15   his State case, so I presume that he would be.  That said,

16   Mr. Yung, as I've stated, is living with Mr. Shannon

17   temporarily and intends to return to his own residence and I

18   don't think that having Mr. Shannon as a third party

19   custodian is either, again, necessary or practical in this

20   case.

21           As for the condition that he not communicate with

22   officials of any foreign power, we just object to the

23   vagueness of that.  If that's related to Indonesia,

24   specifically, that perhaps he not -- I mean, I think it's

25   kind of -- by not attempting to obtain a passport and not

1    leaving this District or the District of Illinois, those

2    conditions would cover that concern and anything about us

3    contacting foreign officials with the intent to leave the

4    District would be duplicative.

5            THE COURT:  Okay, thank you.

6            MR. LAUD:  And, Your Honor, I apologize.  I'm

7    having difficulty with my video feed, but I am still on the

8    line.

9            THE COURT:  Okay, thank you.  Is there information

10   as to whether the defendant still has firearms at his home?

11           MS. SUELAU:  He does not, Your Honor.  According

12   to Mr. Yung, and Mr. Shannon verified this, Mr. Yung had to

13   surrender those related to the protection order with Candice

14   Yung.

15           THE COURT:  Okay.

16           MS. SUELAU:  I believe they're in the possession

17   of a third former FBI agent.

18           THE COURT:  Okay.  Mr. Yung, I'm going to address

19   you directly.  Can you hear me, sir?

20           MR. YUNG:  Yes, Your Honor, (inaudible).

21           THE COURT:  Sir, I am ordering your release.  What

22   I'm going to read to you are the terms of your release, so I

23   need you to listen carefully.  Your attorney will get copies

24   of this paperwork, so you'll have copies eventually here,

25   but it's important, since you won't have these copies

1    immediately, that you listen very carefully to these terms

2    so that you can -- so that once you're released, you don't

3    inadvertently or otherwise violate any of these terms.

4              Do you understand that, sir?

5              MR. YUNG:  Yes, I do, Your Honor.

6              THE COURT:  Okay.  So the first document here is

7    called an appearance bond.  I am releasing you on an

8    unsecured bond of $10,000.  So if you fail to appear for any

9    of your proceedings in the Northern District of Illinois,

10   you will then forfeit that bond, meaning that you will owe

11   that amount of money.

12             So this appearance bond indicates that you agree

13   to follow every order of this Court or any Court that

14   considers this case and you further agree that your bond

15   will be forfeited if you fail to appear for Court

16   proceedings, if you're convicted and you fail to surrender

17   to serve a sentence that the Court may impose or if you fail

18   to comply with all of the conditions set forth in the order

19   setting the conditions of your release.

20             The next document is titled, Orders Setting

21   Conditions of Release, and this document says that it is

22   ordered that the defendant's release is subject to these

23   conditions.

24             Number one, the defendant must not violate

25   federal, state or local law while on release.

1          Number two, the defendant must cooperate in the

2   collection of a DNA sample if it is authorized by federal

3   law.

4          Number three -- well, actually let me ask the

5   probation officer a question.  I am not going to -- this

6   release will -- there's conditions, but it will be

7   unsupervised, but this provision that -- about the defendant

8   must advise the Court or pretrial services of a change of

9   residence, that still applies, right?  And I guess it does

10  say --

11         MS. LEDESMA:  Correct.

12         THE COURT:  So, okay, thank you.

13         All right, Mr. Yung.  So number three, the

14  defendant must advise the Court or the pretrial services

15  office or supervising officer in writing before making any

16  change of residence or telephone number.  And, number four,

17  the defendant must appear in Court as required and, if

18  convicted, must surrender as directed to serve a sentence

19  that the Court may impose.

20         And so you must appear at the Northern District of

21  Illinois.  The address is 219 South Deerborne Street in

22  Chicago on June 30th, 2020 at 2:00 p.m. for your next

23  appearance there, and you must sign the appearance bond that

24  I previously referenced.

25         The next document is titled, Additional Conditions

1    of Release, and this document indicates that you must not

2    obtain a passport or other international travel document.

3    You must abide by the following restrictions on your

4    personal association, residence or travel, which is your

5    travel is limited to the states of Colorado and Illinois.

6    You must avoid all contact directly or indirectly with any

7    person who is or may be a victim or witness in the

8    investigation or prosecution of your case, including your

9    wife other than in connection with the divorce proceedings,

10   and I've also indicated the Consulate of or Foreign

11   Officials of Indonesia.

12          You must not possess a firearm, destructive device

13   or other weapon, and you must obey all orders, including the

14   protection -- protective order associated with the divorce

15   proceedings and your probation in Case Number 2019-m-4941.

16          On the last page, Mr. Yung, it's titled the Advice

17   of Penalties and Sanctions, and this informs you that if you

18   violate any of the conditions of your release, it could

19   result in the immediate issuance of a warrant for your

20   arrest, a revocation of your release, an order of detention,

21   a forfeiture of any bond and a prosecution for contempt of

22   Court and could result in imprisonment, a fine or both.

23          While you're on release, if you commit a federal

24   felony offense, the punishment is an additional prison term

25   of not more than ten years and for a federal misdemeanor

1   offense, the punishment is an additional prison term of not

2   more than one year.

3           It is a crime punishable by up to 10 years in

4   prison and a $250,000 fine or both while on release for you

5   to obstruct a criminal investigation, for you to tamper with

6   a witness, victim or informant, for you to retaliate or

7   attempt to retaliate against a witness, victim or informant

8   or intimidate or attempt to intimidate a witness, victim,

9   juror, informant or officer of the Court.

10          The penalties for tampering, retaliation or

11   intimidation are significantly more serious if they involve

12   a killing or attempted killing and then here is the

13   acknowledgment of the defendant where you sign and it says

14   that by signing, you acknowledge that you are the defendant

15   in this case and that you are aware of the conditions of

16   release and that you promise to obey all conditions of

17   release, to appear as directed and to surrender to serve any

18   sentence imposed and that you are aware of the penalties and

19   sanctions that are set forth above, which is -- are those

20   that I've read to you.

21          Mr. Yung, did you hear all of the conditions of

22   release and the terms of the appearance bond that I've just

23   read to you?

24          MR. YUNG:  Yes, I did, Your Honor.

25          THE COURT:  Sir, do you understand those

1    conditions as I've read them to you?

2            MR. YUNG:  Yes, I do.

3            THE COURT:  All right.  Sir, on the advice of

4    penalties and sanctions where I read to you the

5    acknowledgment of the defendant, that's where you would

6    sign.  Since we are not in the same room for you to actually

7    sign these yourself, do I have your authorization to sign

8    your name to this document, sir?

9            MR. YUNG:  Yes, you do, Your Honor.

10           THE COURT:  And --

11           MR. YUNG:  Yes.

12           THE COURT:  -- by giving me that authorization,

13   sir, you understand that my signing your name is as good and

14   binding as if you had signed this document yourself.  Do you

15   understand that?

16           MR. YUNG:  Your Honor, yes.

17           THE COURT:  The record will reflect that Mr. Yung

18   has given the Court his verbal authorization in these

19   proceedings, which are made on the record, to sign his name

20   on the acknowledgment of the defendant and the Court will do

21   so now.

22           Mr. Yung, the other document you would need to

23   sign would be the appearance bond that I mentioned.  This is

24   the document that indicates that I'm issuing a $10,000

25   unsecured bond that you would forfeit if you fail to honor

1   the conditions of release.  Do I have your authorization,

2   sir, to sign this document as well?

3          MR. YUNG:  Yes, Your Honor.

4          THE COURT:  And again, sir, you understand that by

5   my signing your name to the appearance bond, it's as good

6   and as binding as if you had signed the document yourself.

7          Do you understand that?

8          MR. YUNG:  Yes, sir.

9          THE COURT:  Okay.  The record will reflect that

10  the Court has gone over the terms of the appearance bond

11  with Mr. Yung.  The Court has signed this document where it

12  indicates the Judge's signature and has also signed it where

13  it indicates defendant's signature based on the verbal

14  authorization to sign Mr. Yung's name that Mr. Yung has

15  provided on the record.

16         The record will also reflect that the Court has

17  gone over the order setting conditions of release, the

18  additional conditions of release and the advice of penalties

19  and sanctions and the acknowledgment of the defendant has

20  all been gone over by the Court with Mr. Yung.  The Court

21  has signed the conditions of release and has also -- for the

22  Court and has signed that document on behalf of Mr. Yung

23  based on his verbal authorization on the record to sign this

24  document on his behalf, and so with that, the Court will

25  order Mr. Yung released after processing.

1          So, Counsel, I understand I also need to sign the

2   commitment to another district and the order requiring

3   defendant to appear in that district and transfer bond; is

4   that correct?

5          Just the order?  Just the order requiring?  Okay.

6          My courtroom deputy has informed me it's just the

7   order requiring defendant to appear.  So I will sign that

8   now.

9          MR. LAUD:  And, Your Honor, I think you've touched

10  on a point I just wanted to make sure the defendant was

11  clear on.  Your Honor's order setting conditions of release

12  will cover his removal from Colorado to the Northern

13  District of Illinois and he'll have a bond hearing here in

14  the Northern District of Illinois once he arrives, and so I

15  just want to be clear the government may seek, you know,

16  additional conditions beyond that which he's subject to now

17  once he arrives in the Northern District of Illinois.

18         THE COURT:  Okay.

19         Okay.  Counsel, is there anything else that we

20  need to address on this matter?

21         MR. LAUD:  Nothing from the government, Your

22  Honor.

23         THE COURT:  Okay.

24         MS. SUELAU:  No, Your Honor.  Just before Douglas

25  County logs off, I just wanted to let Mr. Yung know that

1   I'll contact Mr. Shannon to come get you at Douglas County.

2            MR. YUNG:  All right, and thank you so much.

3            THE COURT:  Okay.  There being nothing else, we

4   will adjourn Mr. Yung's matter.  Thank you.

5            MR. YUNG:  Thank you, Your Honor.

6            MR. LAUD:  Thank you.

7            (Whereupon, the within hearing was then in

8   conclusion at 4:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIBER'S CERTIFICATION

 2   I certify that the foregoing is a correct transcript to the

 3   best of my ability to hear and understand the audio

 4   recording and based on the quality of the audio recording

 5   from the above-entitled matter.

 6

 7   /s/ Dyann Labo                    June 29, 2020

 8   Signature of Transcriber          Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```